Case No. 24-13 et al. United States of America v. Andre De Moya, Appellant. Mr. Coburn for Appellant Andre De Moya, Ms. Kelley for the Appellant. Mr. LaCour for Appellant Anthony Merritt, Ms. Kelley for the Appellant. Good morning. May it please the Court, Barry Coburn for the First Appellant Andre De Moya. I've reserved one minute with the Court's permission for rebuttal, and I should let the Court know Mr. De Moya is with us in the courtroom. May I proceed, Your Honor? Yes. We have two issues. From our point of view, they are both discreet and not particularly ambiguous. The first issue has to do with sufficiency of the evidence. Our submission to this Court is that the government essentially, both at trial and here in this Court, has relied on a series of communications that Mr. De Moya was a party to. And the government essentially urges the jury below and urges this Court that these communications are sort of unsavory. You know, I mean, they're certainly very colloquial. Mr. De Moya had a particular way of communicating, which was, you know, very informal. The government takes the position and took the position below that statements that Mr. De Moya made during the course of these communications, principally text communications, were inculpatory, tended to illustrate what the government contended was his corrupt intent. That is to say, his guilty knowledge and requisite specific intent. We disagree. From our point of view, the record in this case essentially provides no evidentiary support for the proposition that Mr. De Moya harbored the necessary guilty knowledge and specific intent. And, you know, the government, for example, I should note, relied below. And I actually, I tried this case in the district court. I have a vivid recollection during the course of the arguments. The government refers to one particular text exchange in which, you know, Mr. De Moya is informed that a particular concession from the OTR has been forthcoming. And he says the word, boom. And the government suggested below. I mean, I can still, as I stand here, I can remember the way they did it in front of the jury. I mean, suggested that his use of that word suggested that he knew that something illegal was occurring. And my submission to this court is that the, you know. What does boom mean? Like, what do you think boom means? Boom is an articulation of essentially happiness, satisfaction, you know. I mean, he's glad that the particular OTR concession that was being sought was granted. And that the people he was working with were going to have to, you know, pay less in the way of taxes. I hate to look at it. I just think this standard of review is really not favorable to you. Could any rational juror find this supportive? And I just think that's really hard. I mean, you can give me an alternative view of the evidence. But it doesn't compel a jury to see it your way. I thought I had a feeling that a question like that would, just like that, Your Honor, was going to be posed during the course of this argument. And that's the reason. Because we thought that was going to be sort of front and center in terms of this court's analysis. That's the reason why we cited the case authority right at the beginning of our legal argument, our legal discussion in the brief, the opening brief. Because it's not enough, my submission to this court is, it is not enough if the record essentially is consistent with it going either way. You know, I mean, certainly, I concede. I mean, is it possible that, you know, an expression of glee or something like that, if you will, that he's expressing that because he has a guilty intent? Of course, it's possible. The problem the government has in this case, and the reason I think we meet that standard, and listen, we absolutely understand the nature of that standard, and we understand that this court. Tell us how you meet the standard. I'm so sorry, Your Honor. Go ahead and tell us how you meet the standard. Yeah, I mean, the issue basically from our standpoint is that there has to be actual affirmative evidence pushing the fact finder in the direction of inculpation. It can't be a situation in which it's essentially just neutral. I mean, and our submission to this court is that that's, I mean, the word boon in this context is just a perfect sort of representative. It's a great allegory for the nature of the evidence below. I mean, that's not the sole evidence. I thought some of the evidence that was more, it was less ambiguous was in reference to the top promo transaction that Mr. DeMoya described it as not proper and not an up and up thing, which more than boon seems to me to, you know, then you take it together in context that seemed problematic to me. That's why we highlighted that particular contention on the part of the government in our reply brief, and I think actually the very beginning of our reply brief I think squarely addresses that issue. He didn't actually say that. I mean, the way the record, at least according to my understanding of the testimony, Mr. Amershahi never actually alleged that Mr. DeMoya said this is improper or something to that effect. That's not what happened. But he made it clear that it was not proper. That was Mr. DeMoya, that was Mr. Amershahi's subjective impression as he conveyed it to the jury. Why is there not enough evidence for the jury to find him guilty? That's not evidence. Is there a sufficiency of the evidence? My submission is that's really, in terms of the substance, that's really not evidence at all. But that's not all you're relying on. There's a lot of other evidence here. What about the conversation, this is at essay 42, where they're talking about we need a settlement in full letter to cover up the problems. And DeMoya is telling me, what do you want to do? The guy's blowing me up for the other 10K because he wants another $10,000. I'll get it, but please tell him wiping it out gives us nothing to stand on. That means wiping it out is illegal, but we need to cover it up. It seems pretty clear. We need to give a check that says paid in full for part of it. And then DeMoya, let's get him the 10K today. Then I will express concerns, but he has already put it in the system. Why is that not very strong evidence that DeMoya knows exactly what's going on? This is DeMoya's own words. Well, he knows exactly what's going on in the sense that he has engaged an expediter, and the expediter is essentially serving as an advocate, if you will, or an intermediary with the OTR. You're giving the evidence in the light most favorable to Mr. DeMoya, but we need to do the opposite. Absolutely. I fully understand that. I don't quibble in any way with the standard the court needs to apply here. My suggestion to this court is that that evidence, like, for example, that conversation colloquy that Your Honor just read, that is not substantive evidence of a guilty mind, of guilty intent. It's not substantial evidence. It's just not direct evidence. I don't see how it's not evidence of a guilty mind. I don't mean to quarrel in any way, but I'm just suggesting to the court it's my submission to this court that it's not evidence of any kind. It's evidence of the following, that Mr. DeMoya knew he was dealing with an expediter, that that expediter was charged, was being paid in cash, and was, as expediters were, and there was lots of testimony about this below, and was charged with attempting to reduce the tax bill for these individuals. And, you know, that's, Your Honor, I can, I mean, I'm sensing. Wipe it out. Wipe it out. Absolutely. If it's possible to wipe it out, then the expediter is charged with wiping it out. The problem is that that is not in any way per se illegal. There was testimony below in our affirmative case about the fact that the OTR negotiates tax bills sometimes almost to their entirety all the time, and there is no reason to disbelieve that. The government did not contend to the contrary. The fact that there was an attempt made to wipe out that tax bill does not connote any knowledge on Mr. DeMoya's part that the mechanism by which that was to be achieved was through bribery. What is your best evidence, your best evidence in the record, that you can point us to that Mr. DeMoya did not understand the illicit nature of these transactions? There is absolutely, I have to concede, Judge Millard. There's very little in the way of affirmative exculpatory testimony in the record that I can point to. My problem and my argument to this court is that there is essentially nothing on the other side of the coin either. There is conversation which the government, and I concede sort of successfully argued to the jury below, was unsavory, seemed unsavory, unpleasant. Like, for example, the use of that word boom and lots of other, you know, extremely eloquent. Unsavory or unpleasant is simply contextually how you piece all of these comments together when at least everyone else around him seemed to understand the illicit nature. But I get it that it's inferences from words. Well, that's my narrative. The counter-narrative, I'm sorry. I appreciate it very much, Your Honor. I was just going to say very briefly, that was our principal problem below. And, in fact, Judge Walton, I thought quite properly, administered a curative instruction midway through the government's closing argument about this, about, you know, sort of the suggestion that others may have had a perception. For example, it was in the context of Mr. Amrishai that he testified that he had a perception that this was, to use Judge Pan's word, improper. That is seriously problematic. And Judge Walton correctly told the jury, you can't use that. There has to be actual evidence of what's in Mr.—inculpating Mr. DeMoya, of what's in Mr. DeMoya's mind. And that evidence is absent. What do you mean by actual evidence? Circumstantial evidence count? Yes, absolutely. Reasonable inferences from that circumstantial evidence count? There has to be actual inferences. In other words, it can't be just sort of a vacuum. There has to be an actual inference moving the fact finder in that direction. And having interposed that quibble, yes. Sorry. I'm sorry, Judge Bullard. So I was just asking about the counter-narrative that you think is consistent with the evidence, that it is certainly lawful to negotiate. You have outstanding tax liabilities. You're not going to be able to pay them. You want to pay them, but you can't. And you go—I mean, I don't know. You go and negotiate with the office. And it's busy. You have someone else go and negotiate. And the idea is that the expediter wants cash to do that work and can use the cash to quickly make a deal. So talk us through it. What do you think is the available inference, in fact, that knocks out the ability of a reasonable juror who's not jumping to conclusions to convict? I think the way Your Honor just put it is almost perfect from my standpoint. I mean, basically what you have here is a situation in which, you know, and there's testimony below in this case, expediters are utilized, not at all infrequently, in interacting with the D.C. government. Now, there is testimony to the effect that they're not supposed to be used in the context of interacting with the OTR. But there was no evidence that Mr. DeMoya knew that or that it was, in fact, that that supposed knowledge was publicly available anywhere. And so, as Your Honor just put it, I mean, an expediter is hired not just because, you know, the person hiring the expediter is busy, although certainly that's part of it, but because the expediter has some kind of expertise, you know, some sort of knowledge of the agency or maybe a success rate in the past or something to that effect. And the expediter interacts with the agency. The expediter has, as Your Honor correctly notes, cash. That cash could be utilized in order to settle a tax bill, or certainly the expediter has a right to, or at least according to Mr. DeMoya's understanding, the expediter has a right to make a profit from this transaction as well. The problem that the government has in this case is that there is no evidence of record that Mr. DeMoya had any knowledge that cash is being handed in the form of a bribe to Mr. Slater. There's no record evidence of that at all. There's also no evidence that anybody was asking anybody about sort of equitable arguments, you know, what are your tax documents, what's your history, why should your taxes be reduced and someone else's shouldn't. There's just zero, zero focus on that. I don't disagree with that necessarily. I'm not sure that there is any. There is much substantive evidence of the record in terms of, like, what the expediter was, like, supposed to do in terms of making an argument for cutting down the tax bill. I take the court's point about that to a degree, but the problem from the perspective of the defendant, of Mr. DeMoya, is he's hiring somebody and relying on them to interact. That person is, you know, eliciting information from Mr. DeMoya, Mr. Amrishai, or others. To whatever extent he thinks that information is useful. Could it be that, you know, in part, there's like a sort of a personal relationship that's at play here between the expediter and whoever he's interacting with at the OTR? I can't eradicate that possibility, maybe, but that's not a crime. It's unsavory, but not a crime. All right. Thank you very much, and we'll give you a couple of minutes on rebuttal. I'd be very grateful. Okay. I haven't touched on the jury instruction issue, but if I'm allowed to do that on rebuttal, I'd appreciate it. You probably can't do it on rebuttal if you don't do it now, so give us one minute on jury instruction. Very grateful. So the argument with respect to jury instructions, I don't think I need to take much of the court's time via oral argument on this, is that the instruction administered by Judge Walton, and I have to concede Judge Walton is a wonderful judge, extremely careful, he gave us every opportunity to communicate with him about this issue, but ultimately where he settled, from my point of view, I would argue to the court, was wrong in terms of the way the Supreme Court has explained, particularly via McDonnell, the way the Supreme Court's explained the nature of the specificity requirement. Judge Walton's instructions, and this is quite deliberate, he thought carefully about it, I don't dispute any of that, but, I mean, the notion that there has to be a specific linkage between a payment made and a specific official act as defined in McDonnell and the other cases we cited, I don't think this issue is- Why is the jury instruction inaccurate? It said the government must prove beyond a reasonable doubt that the defendant intended to influence a specific official act. Because the instruction also very specifically says a course of conduct is sufficient. If there's a link between a payment and sort of an extended course of conduct, that that's enough to convict. That's wrong. That's irreconcilable with McDonnell and with the other cases we cited. So your argument is that there is a correct instruction, but there was, in addition, an incorrect instruction? I guess I would have to say that's right. I mean, that language that Your Honor just cited, I have no quarrel with it, but put together with a specific paragraph or a couple of paragraphs- The government does not need to connect the thing of value to a specific official act. I agree. So undid the specificity of the other instructions. But better than I did. Any other questions? All right. Thank you very much. Thank you very much. Ms. Kelly? Good morning, Your Honors. May it please the Court, Catherine Kelly on behalf of the United States. Your Honors, it's just obviously clear in regard to the sufficiency of the evidence here. The circumstantial evidence is equal to direct evidence of knowledge and intent. This is not a situation where it's unclear what Mr. Des Moines knew, particularly when you look at Mr. Amershahi's testimony about their interactions at the beginning of this scheme. Mr. Karagounis, Mr. Amershahi's business partner, was the one who said, go talk to Des Moines about this $258,000 tax bill that Top Promo owed. He did so. And during their conversations, his testimony, Mr. Amershahi's testimony, was that Des Moines had made clear to him that we have to pay cash and that it was not proper what they were going to do. So Mr. Amershahi testified that he would not have given cash to Mr. Merritt to get the tax liability reduced for Top Promo if Mr. Des Moines hadn't told him that he had done the same thing. In addition, his communications with Des Moines, through those communications- That's true. What that shows about intent, it just shows that there's this guy. He knows the people there. He's got good relationships. He can get the best resolution for you, but he takes cash, as we've shown so far. But Mr. Des Moines, during those conversations, Mr. Des Moines made clear to him that what they were doing was not proper. So he has to pay cash, and it's not proper. Is there any particularity in the evidence as to how he came to that conclusion, that it wasn't proper, other than you have to pay cash? It's not clear the exact wording of the conversations. He wasn't asked to verbatim say who said what, but that was the- When he finished the conversation, that was the impression that he had, and he had that impression based on the fact that- There's no record basis for that, evidentiary basis for that conclusion, other than that was he's got to pay cash. That's what I did, and this guy, he really knows what he's doing. He knows the people there. He got my tax this way down. Pay him cash, and he can do the same for you. He said that Des Moines made it clear to him that they had to pay cash, and that it was not proper. No, the guy takes cash. I'm not disputing that. But also- I'm not sure what you got to pay cash shows about Mr. Des Moines' intent. Also, he's indicating to Amar Shahi that what they're doing is improper. I know, but he said there's no- That was sort of a characterization given by Mr. Amar Shahi, but there was nothing actually in the record to explain the basis for that conclusion to even allow the jury to make that reasonable inference. My understanding of the testimony is what Mr. Amar Shahi was saying is that Mr. Des Moines made clear to him. The difficulty is that there wasn't testimony that Mr. Amar Shahi says to the jury, you know, before the jury. I don't remember his exact words, but I know he told me it was improper, as opposed to I got the impression. So that, I think, is the difficulty, that even if you don't remember the exact words, and Amar Shahi doesn't testify to Des Moines' exact words, that he doesn't even testify that there was a verbal expression from Des Moines that led him, that confirmed for him that this was improper. And, in fact, you point to that Amar Shahi was more comfortable because Des Moines had done it himself, but that could cut the other way. Des Moines is doing something that would put himself in jeopardy, but no, he's doing it, and so Amar Shahi was speaking what was specific to it. But what we have here is not just that testimony. We also have Mr. Amar Shahi's testimony that the next step was working out a cash bribe that he paid to Des Moines. There's also evidence here, and it's not just those conversations. It's also the additional testimony and the actions that you have here. You have Mr. Des Moines frequently, he actually met twice with Mr. Slater and Mr. Merritt outside the OTR office about these transactions. Is that suspicious? It is suspicious. If you're going to meet with clients outside government buildings before or after a meeting all the time, when I was practicing. But if you're at, if you have an OTR issue, it certainly is strange if you're taking your conversations to the Starbucks inside a Safeway grocery store, for instance, when you could just as easily be at the OTR office talking on the up and up. You have that, you have the fact that there's evidence of Mr. Des Moines multiple times actually paying the bribes and obtaining bribe money from Mr. Amar Shahi. Wait, paying bribes? Where's the evidence that he handed the money, what you're calling bribe money, over to Mr. Slater? Where's that? Mr. Amar Shahi is saying he worked out a cash bribe that he paid to Des Moines. That was at SA-179. There's additional... This is your cooperating witnesses characterization of these things, but it still hasn't... I mean, when asked for more details about how he got this sense that things are improper, he just, he sort of talks in circles and then goes, I really don't know. What we're looking for is something, you've got these statements that themselves are not really inculpatory in any way for Mr. Des Moines, and then we're leaning on someone else saying, well, you know, a cooperator saying, well, I thought it was improper. I thought I got from it all that it was clearly improper. But he doesn't have a basis that he got a... that Mr. Des Moines conveyed to him that it was improper. But then when asked for any factual basis for that conclusion, the record's just empty. You don't usually see things like that. You know, he was winking his eyes. He was putting, you know, put the money in a bag. There's just nothing like that. It's just sort of this conclusory assertion without anything. It's just a very curious record in that regard. Well, we believe the way that the testimony was phrased, we believe that the jury could make a reasonable inference that Mr. Des Moines was telling these things. That is factual evidence about the circumstances from which the witness drew that conclusion, other than you got to pay cash. He paid cash. It worked out well for his taxes. I got to pay cash. That's just what this guy wants. But it's more than that, too, Your Honor. You also have the additional testimony or the additional evidence of time and again during the course of these transactions, which lasted from 2015 through, I believe, either the end of 2016 or beginning of 2017, you have time and again, in particular, Mr. Amrshahi working out these arrangements where his company does not pay a dime of actual taxes owed to OTR, and that through this system they end up having their taxes either reduced very, very low from the first instance, $258,000 to $42,000. And then time and again, Mr. Amrshahi is then looking for cover documentation in case it comes up later and somebody questions us about this situation, and he's asking Des Moines time and again, get me something that shows that essentially that this is legitimate. Mr. Des Moines is getting him this documentation. I'm not sure that that inference is necessarily the stronger one. If I pay a lot of money for anything, I want a receipt. Right, but he knows. And so in a sense, it's like, what have I paid this money for, legitimately or not legitimately? I want to know that the thing that I have paid and relied on reliance that something occurred, that I'm getting that occurrence. So what about wanting some verification adds to the illegality inference here? Because first of all, Mr. Des Moines is passing these documents back and forth, these OTR statements back and forth to the owners of the businesses, including Mr. Amrshahi, showing that one day they owe $258,000. There's another day where it comes down a little bit to $256,000. Mr. Des Moines then saying, can we get it from $90,000 to $80,000? And then boom, the next thing that happens, he's passing on a document that says $40,000 or $42,000. I don't recall the exact number. Knowing that this hasn't been paid for because there's some actual tax payment being made, so what you're getting, he knows seeing these going down that he's not getting a receipt for having paid $258,000 that was owed. He's not really getting a receipt for $40,000 that's really owed after these arrangements have been made. He's just getting a piece of documentation to cover it, to make it look like it was a legitimate receipt or a legitimate payment plan in the first instance with top promo. But the document comes as pretty good cover because it comes as an offering compromise, which suggests we accepted, we the Office of Tax Revenue, accepted less money than was due as a kind of settlement. And here's the payment plan, acting as if it was given in installments over six months. Right, right. It is that, but as obviously as Mr. Des Moines can tell, he's as the documents show, particularly the summary charges the FBI agent testified about, there are just never ending communications with Mr. Des Moines to Merritt, Merritt speaking to Slater, and then back down the chain where these arrangements are being discussed. So this isn't a situation where it's just a matter of Mr. Des Moines pops into this scenario at certain points and just transfers a document or so forth. The strange thing is everybody else in that chain, one Mr. Des Moines is just unnecessary in that chain. Mr. Armachai and the others can talk directly to Mr. Merritt. He's just introduced them to the guy who was really helpful to him. But he wasn't necessary. Why would he make a penny off any of these himself? I don't recall there being testimony that he was making money. While he engages in this criminality, he's helping his friends. That's exactly the point. That sounds like a much more innocent motive. This guy didn't do the work for me. I don't know. I had to pay cash. That's how he wants to do things. There are people who want to do businesses that way. His motive frankly doesn't matter, Your Honor. His motive is not an issue. But I'm just sort of saying that if we understand it, it seems, it seems almost illogical to me that someone would be engaging in knowing criminal behavior. Everyone else is making money around him right and left. Lots of money. He made money, too. Well, he got his taxes reduced. For his own business, the Echo Events, he got a clean hands certificate on one occasion. He got his taxes reduced from 69,000 to zero. So, A, he's helping himself, and he is making money in that manner. Also, it was testimony to Mr. Slater during that first meeting where Mr. Amashari had been apparently worried. He's not making any money from this go between. You listed this chain up and down, this piercing chain. Right. But whether he's making money, he made money on that. Because he's passing the bribe money along. He's getting money. He's literally telling Mr. Amashari during the barcode transaction, let's get him $10,000 today. The conspiracies like this where there's one person who's sort of an important go between, in your view, involved again and again, day after day, doesn't ask for a penny, doesn't get a penny. I don't know. But, Your Honor, that's neither an element of a conspiracy or necessary to bribe money. Where is that an element? I'm talking about how a jury is going to look at this. The jury looked at it as, in fact, Mr. DeMoya having intent and having knowledge of what was going on. Mr. DeMoya advised Mr. Amashari, for instance, when he was deciding whether there was a reasonable evidentiary basis for that. And given the fact that you're looking at the evidence in the light most equivalent of direct evidence of intent, given the meetings, the conversations Mr. Amashari is saying to, or Mr. DeMoya telling Mr. Amashari, let's get him $10,000 today. And what do you think is the most inculpatory, your best piece of inculpatory evidence? Is it just Mr. Amashari saying he conveyed to me that it was improper? I would say that is number one, but also combined. And I don't think that there's one that balances out the other. Mr. DeMoya continuing to tell Mr. Amashari, let's get them the money today because he's already done the deal. He's already put this in the system and you can, you can get your cover documentation later. I'll talk to them later about that, but let's, let's move this along. He knows there's something wrong with that. I know it wasn't charged this way here, but is it bribery if there's a legitimate negotiating process, but you pay to get jumped to the head of the line to actually work something out for your business with the office of tax revenue? I don't think so, Your Honor, because what you really, the question with the bribery is whether or not this payment that you're making is going to influence the official act itself or cause the person. To put you in higher up in the queue, some people may never actually get a chance to work with someone like, to have their representative work with someone like Slater. That's not part of the case. It certainly wasn't a theory here. The official act here was about the payment of taxes that were owed to DC and the official duty that we asserted that Mr. Slater had breached was his duty to properly collect those taxes. I'm not, I'm paraphrasing obviously, but paying money to jump the line would not change either of those two, either the act or the duty. It would get him there quicker, but it would not, in this instance, have affected the official act or the official duty. If you're honest, I have no further questions on that. I would just say briefly in regard to the jury instructions that the McDonald case does not touch on course of conduct bribery at all. It doesn't rule on it and it does not rule out course of conduct as the proper theory. But it's very clear that there has to be identifications of specific official acts or duties in that situation. Specific, and it underscores this use of the word specificity. And that this course of conduct instruction says the government does not need to connect the thing of value to a specific official act or violation of official duty. Right? And it goes on to say that just this course of conduct in which in exchange for Mr. Slater's pattern of being influenced, right, money is given. But that sounds like the retainer theory, like we're giving him money and at some point he'll do some good stuff for us. And I believe a number of circuit courts have said post-McDonald that retainer theory no longer works. And I'm just, I'm quite concerned about the instruction here elsewhere. As Mr. Colburn acknowledged, the judge was quite clear that you have to have specific acts identified. You can't just sort of generally say I think we're going to do something at our government job for you. But here it's all unraveled. It's just that you don't need the very specificity that, you know, there's an entire paragraph in McDonald where they get out the thesaurus and use every version, every form of a synonym for specificity that you can think of that has to be part of the instructions. So what do we do with that? But McDonald is talking about the definition of official act. And it can't just be in McDonald making a phone call for somebody who's a business clerk. With specificity, what is an official act? The court actually defined official act in this case, not only just as a general term in language that... They used specificity multiple times in the McDonald decision. They were just kidding? No, they said you have to have a specific act, which they did here. The court instructed... The jury has to find a specific act, correct? Right. And that is a violation of an official duty as properly defined. It has to find either an official act that the person undertook or a violation of an official duty. Specific official act or specific official duty.  Okay, but right. That's like we're in agreement on that. Right. You have to find a specific official act. And then... And the court actually defined the official act that was an issue in this case. At A524, the court said that in this case, the government alleges that the question matter, cause, suit, proceeding, or controversy is whether a specific business must pay tax and tax-related liabilities owed to the District of Columbia government. That follows the language. Right. I'm talking about the force of conduct. The force of conduct only... I'm sorry, Your Honor. Which unravels all that. The government does not need to connect each thing in value to a specific official act or violation of duty. That's my concern. This sounds like, well, if you were just paying him and at some point in his job, he was going to do some helpful thing or things for you, that's the retainer theory that's been rejected post-McDonnell. We don't believe so, Your Honor. It's essentially saying... I don't know what it's essentially saying. I want to know what it's literally saying, which is you don't need a specific official act or violation. You don't need jury to find... If you use this force of conduct theory, you don't need to find a specific act or official act or violation of a duty. I do not believe that's what McDonald says, Your Honor, and I don't believe that's what the instruction said. That's what the instruction said. That's exactly what the instruction said. McDonald... The page just left... It's part of the transcript. That's not the same transcript. McDonald... I'll tell you what it says. McDonald left the same quid pro quo definition as has been used in cases all along, such as in Sundiamond. It said that the quid pro quo... Section 201, the bribery statute, prohibits quid pro quo corruption, the exchange of a thing of value for an official act. The force of conduct theory leaves room for that, as a number of courts have said since McDonald. The Fourth Circuit has said it in McCabe. It says that their prior course of conduct language in their Jennings case and McDonald's can be applied harmoniously. The First Circuit in Woodward said that the court was confident that a stream-of-benefits theory remains valid post-McDonald's. In addition, the silver... I want... Have other circuit courts rejected the retainer theory post-McDonald's? I am. I'm not. We were not relying on retainer theory, Your Honor. It's possible, and I'm not familiar enough with retainer theory. So we're concerned about going into conflict with other circuits, and they've rejected a retainer theory, and yet we have a course of conduct instruction. Correct. That says we don't need the specificity that Spring-Court talked about again and again. I'm sorry. Is there a difference between course of conduct and retainer? I'm not honestly familiar with the retainer theory, and I just don't know. It wasn't something that came up in our research. This was charged as a course of conduct, and I don't frankly know. But even if we assume that it was erroneous to include this course of conduct instruction because it conflicts with McDonald's, was the error harmless? Because it seems to me that all the evidence in this case was specific payments for specific actions.  It seemed very much focused on a particular tax liability they wanted reduced, and the payments were to reduce a particular. That's correct. There isn't any question about what type of action they're seeking in making these bribe payments. They want their business taxes reduced or reduced to zero in some instances. And so there really isn't a question about what they want done and whether or not. And you could also, you could call that a breach of an official duty on Mr. Slater's part. You can call that an official act that Mr. Slater took. Both ways. But I guess is there any way. You have a pat on the official act. Is there any way based on this evidence that the jury could have convicted based on a course of conduct theory versus a specific act for a specific payment theory? I think so. I mean, it's not, there's not that much daylight here. I have viewed course of conduct theory as saying that if a payment is made, you don't always have to link that specific payment to the very specific act at that moment. However, that's not to say that you don't overall have to show that a bribe was paid for an official act. It's just a matter of. That's not completely contradictory to what you just said. No, I'm thinking back to the Patesville case, Your Honor, and obviously they didn't decide the issue on course of conduct because nobody argued against it. It's not an issue at all in that case. Right. Right. But it was a matter of not linking every dime that was paid to the agent in that case to a particular provision by that agent of contact information for them. Do you agree that McDonald's held that the definition of official act must also be something specific and focused? That is pending. That may well be brought for a public official. Has to be. This is part of their definition of official act. Must also be something specific and focused. Right? Right. I don't quibble with the definition of official act in McDonald's. Do you disagree that the course of conduct instruction here said the government does not need to connect a thing of value to a specific official act? Do you disagree that that's what the course of conduct instruction said? I don't disagree with the language that was used in the course of conduct. I'm just saying that you're not having to show that this particular dollar was paid for, for example, reducing top promos tax liability from $258,000 to $40,000 because you made a certain payment on a certain date. In this case, I don't think that there's really, frankly, much daylight between the proof because you're not talking about a whole stream of payments that were consistently and constantly being made so that you could, over time, keep getting the same person to do the official act. That's an argument that's really healthy, doesn't it, Ms. Kelly? Because if we wanted to say this is harmless because there was no evidence that the jury could rely on the course of conduct requirement, then it could be harmless because they could only rely on the correct direct quid pro quo type evidence. But you saying that there's no daylight between the two that could have relied on course of conduct would mean it's not harmless in the event that the course of conduct is incorrect. So I don't know that it helps your position to say that these are the same thing and they could have relied on course of conduct if course of conduct is erroneous. All right. But we have no law saying that course of conduct is erroneous after the decision in McDonald's. Yeah. I do have an issue preservation question about that because I don't know that that argument was ever made in that articulation challenging the course of conduct argument in the blue brief in this case. So it's just not clear to me that this issue is properly raised before us because I think it would be, I guess, a big deal for the court to hold that post-McDonald, our prior case law in Ring that said course of conduct is an appropriate theory has been overruled, et cetera. I just don't think it's really been teed up here in that fashion or teed up in an appropriate way. So I have procedural questions about issue preservation and also harmlessness. I did see, I believe that there was a request before the jury instructions were read that the court remove the course of conduct instruction. It's in our brief in the procedural history for that issue. So it was our position that it had been teed up. So I don't want to mislead the court in that regard. They redlined the whole thing out, right? They just wanted to redline it. The whole course of conduct. Right. Right. But anyway, again, though, there still is not law that shows that post-McDonald, particularly in the Fourth Circuit, all these other circuits that we cited in our brief, they're not saying that the course of conduct instruction was undercut by McDonald. They're saying, and particularly in the Fourth Circuit, that the McDonald's could be applied harmoniously with the course of conduct theory or a stream of benefits theory, as it's called in some courts. Just to help me put this in context, can you explain what the difference is in your understanding of the two ways that Judge Walton instructed that the bribery statute could be violated? I'm looking at the jury instructions in JA 523. It's page 26 of the actual jury instructions. He talks about a first way the defendant intended to influence a specific act or official act, and that's all very specific. And I gather the difficulty that the defendants are raising is the second way, which is bribing to try to cause Vincent Slater to violate an official duty. And then on page 525, lines 8 to 11, it's not necessary that the government-proven official act was influenced or that Vincent Slater actually was induced, motivated, or encouraged. And then at the bottom of that page, the government does not need to connect each thing of value to a specific official act. But then on page 526, lines 5 to 6, Judge Walton says, with respect to the second theory, the government must show that the things of value were given to Vincent Slater would be intent or accepted with the understanding that in return an official act would be influenced or that Slater would be motivated or encouraged to violate an official duty. And I guess the – I just am not sure what your understanding is of these two different theories. My understanding is you can – in some cases, somebody could have an official duty to do something or to not do something, where they wouldn't necessarily be in a position to take an official act on behalf of an agency, for instance. Here – I mean, that was the situation in the Patesville case that we cited in our brief. Here, it works both ways for Mr. Slater. He is somebody who has taken an official act on behalf of OTR, the reduction of the taxes, and he had an official duty, essentially, and I don't recall exactly the wording, that official duty was defined as a duty to enforce the District of Columbia tax laws. So he was violating his official duty also. The jury could have decided on either of those grounds that Mr. DeMoya was engaged in bribery, and it did. I don't know which one they chose, but we're just saying that the course of conduct is literally you just don't have to take this $5 and say that affected this particular moment in time or this particular act by Mr. Slater. Or if, for instance, that came three days later. It doesn't really support that in this case, does it? I would think to me that they were asking for specific reductions of specific tax bills and making specific payments to get those reductions. Right. I think in this case, they probably could have done without the course of conduct instruction, and just because there were – it was clearer in this case than I've seen in others where there was a payment made, and it went through and everything, you know, whether it was right before or right after. If we wanted to hold or were considering holding that the course of conduct instruction is now erroneous post-McDonald, should we order supplemental briefing? Because I just don't think that this has been briefed in that way to say that our prior case law, like in Ring, for example, has been obviated by McDonald, et cetera. And it's not clear from the parties' arguments at the podium what other circuits have done in this regard and what the difference is between a course of conduct instruction and a retainer theory. The government would be happy to provide additional briefing if the court wanted it on that topic. But in this case, we really do believe that there was really, as I was saying earlier, there wasn't a situation where it was very questionable about what payments went to affect what transactions. That's the point. Like, what work was the course of conduct instruction doing in this case? The government asked for it, so. It covers a situation where – They asked for it in this case, so what was it covering in this case? Not a generic situation. Right, right. It was covering up, somehow allowing evidence to come together in a way. I guess we don't have evidence of, you know, exactly what was said in some of these cases from Mr. Merritt to Mr. Slater. Right, and when you have the actual payments being made, you don't know exactly when the money got to Mr. Slater, for instance. And so if there's any question about the timing of whether or not he was really doing something before he was getting paid, I think the course of conduct instruction could help aid the jury there, because they don't have to say that on Tuesday, Mr. Des Moines got the money, and then it made it to Mr. Slater by Thursday, and then Friday morning he made the changes, for instance. You don't need that specificity. And that's really what the course of conduct instruction, in our mind, goes to. It also wasn't clear to me from this case, but you know it better than I do. Some people were getting their taxes wiped out all the way. Some were getting reductions. Some wanted paperwork. And so it was sort of more a – it would allow the jury not to have to figure out exactly what official duty it was, or what official act was procured or even asked for in this particular case. Their duty was quite as long as, you know, this money's coming in and then this output is coming out from Mr. Slater, whether it's a reduction or a complete erasure. Well, the way the official duty was defined was that he had an official duty to apply the tax laws correctly. So I don't know that it necessarily mattered, whether you're talking about getting the false coverage letter versus actually doing the tax reduction. How he might have applied the law incorrectly. This kind of helps bridge the very gap. They see the income. They see the output, the results. Right, right. And what he was doing in the middle, this bridges over that. Right, right. And so for all those reasons, Your Honor, we respectfully request that Mr. DeMoya's convictions are affirmed. Thank you. And actually, Mr. Merritt, because he also argued, he joined the argument on the jury instructions. Okay. Thank you. Okay, now we'll hear from Mr. Lecker. I'm sorry, I did promise you. You wanted a minute for rebuttal. I apologize. No, Your Honor. Very kind of you. And I don't think I even need a minute. I just wanted to address very quickly Judge Pan's question about preservation, which is, and here my memory is imperfect, but I think we actually made a written submission below on this issue. And I appreciate the government's concession about it that they just articulated, and I think they're right. But I tend to always be worried whenever I'm trying a jury case about Federal Rule of Criminal Procedure 30, which is very restrictive in terms of preserving objections to instructions. All right, I will tell you that you did, you asked to have the whole thing, course of conduct one, deleted. I did. And I'm pretty sure we referred to Caldwell in some of the cases for authority in terms of why. But in your blue brief also, do you think that you've properly raised this argument? Because I don't see your blue brief making these arguments that the course of, specifically targeting the course of conduct instruction. I find that it did that. I just see block quotes and no analysis. Yeah, I appreciate that. I thought we did. I thought we referred specifically to, you know, the specificity of requirement in Caldwell. But, I mean, I'm highly imperfect. I don't recall it verbatim, but I think we did. I believe that's all I have. All right. Mr. Coburn, you are appointed by the court to represent Mr. DeMoy in this case, and the court thanks you for your assistance. It was my pleasure. Thank you, Your Honor. Thank you, Your Honor. Good morning, Your Honor. May it please the court, Steve LaCar for Mr. Merritt. I've reserved a minute and a half for rebuttal. Perhaps I can distill our argument into four basic points. The government and Mr. Merritt have cited the same two appellate cases for the simple proposition bill when it comes to the loss table. I'm talking about the Seventh Circuit case in Moose, Second Circuit case in Algaheim, a sua sponte decision out of the Second Circuit to address the flaws in the loss table. These two circuits both say that trial judges are allowed to consider policy reasons to get variances from the fairly significant sets as would otherwise be recommended under the loss guideline. Now, there's no dispute between the government to which credit and with Mr. Merritt that we've identified arguments that could have been raised below it weren't. Our briefs, I think that- I'm confused about that argument. Judge Walton asked for and got comparator evidence, learned that most judges in this district or a lot of judges were departing downward from the loss table. He asked for comparator information. He made an extraordinary downward variance. The loss calculation on the table was 1.5 million, 3.5 million. His variance went down so far that it was the equivalent of knocking the value down to 150 to 250,000, right? That's gone from millions to 100,000. Now, where have you argued in your brief that that downward variance was not commensurate with the other downward variances that you discussed in your brief or was not commensurate with what other district court judges have done? I think, Your Honor, we referred to the Dow case on the Second Circuit and to this court- Where have you shown that the variance granted in that case by a district court was more than the variance and was so starkly more than the variance that was granted in this case? It's impossible to find out because there's no data. Well, then how do they know? I mean, you got- the judge departed dramatically from the loss table precisely because that's how other district court judges were doing it, because of its overstatement of- I mean, ten times lower value amount, right? You look at the volume. You haven't challenged the finding of the amounts themselves. No, we did not. Okay, and so instead of getting sentenced for 1.5 to 3.5 million, he got a sentence that was equivalent to 150,000, right? That's a ten-time reduction. What I'm saying to you, Your Honor, you're saying because he got a sentence of less, significantly less than the normal guidelines, the recommended guidelines range, that the inquiry should end there. No, because he got a very- no, what I'm saying is you need to show us. Your whole argument here is that had someone argued to him that the loss table overstates culpability, that's what you spend a lot of pages on, talking abstractly about courts and other circuits, he would have had a downward variance and not credited the loss table, and that's exactly what Judge Walton already did, and you haven't shown that what he did was not in line with what the other judges- It's impossible to show that, Your Honor, because you don't know. Do you dispute the significant downward variance that he made? I give it credit, Your Honor, but- Okay, but do you dispute that it took him down to a much, much, much lower dollar range, the equivalent of much lower dollar range on the table? It's an artificially inflated- it's an artificially inflated loss table. Because he deflated it. I mean, if you want to show that this argument somehow, the absence of all the law review article citations- Increased citation. Does not prejudice him. Yes, but he already did it. Do you- let me ask you this. You know how many months down he varied? He went down- Out of line from- was that out of line with what other district courts, judges in this district have done? If we had a database, we could study that. We don't know that. That's another argument- He just spent a lot of time telling us what other courts have done. So you have found other decisions. That's the problem. Look at Judge Westport- And the district court in this case had evidence of what other district court judges in this district were doing. He asked for it and got it. So apparently it can be obtained in this district. He got some from the government. What he got from the defense council was lackluster and was destroyed by the government. Did you challenge the accuracy of what the government provided? No, I didn't challenge the accuracy of that. What I'm saying is- If it's accurate and if what Judge Walton did was commensurate, I just don't even understand what the point of your argument is. Judge Walton did. I'm not saying he had to or not, but he did exactly what you're arguing for. And you haven't argued at all that it was out of line with what the sentence should be. We have, in fact, said this, Judge. There is no database in this district that gives you an ability to understand. No transparency. This is a data-driven process. No ability to understand what similar sentences were. There are no written, very few written decisions, as Kevin brings up. You want transparency. Decisions in this court, in our district court, are matters of public record. The fact that somebody hasn't compiled them is not an excuse for not showing, if you want to have an, if you want to win on an ineffective assistance of counsel claim, for showing prejudice by looking at those public records. This is not effective assistance of counsel claim for showing prejudice in judgment. Let me assure you. It is. Your whole argument here is an ineffective assistance of counsel claim. That's correct. Okay. And you have to show prejudice. The issue of prejudice is addressed by Taylor and is addressed by Dowell. Just because Judge Walton gave a certain number, gave a sentence, influenced by the hydraulic effect of a recommended guideline range, just because he gave a sentence and varied down, that doesn't mean you couldn't do more. We don't know. Of course you can do more. You don't know. To show that's not prejudice. Your whole argument here, as I understand it, is that he should have been informed about the problems with the loss table. He should have been informed that other courts have identified those problems and as a result have varied downward from the loss table. Correct? Based on some or all of the reasons that we've identified. Yeah. Okay. Well, I don't know. All right. And in this case, he was informed that there were lots of people in this, lots of judges in this circuit on the district court that would vary downward from the loss table because it was viewed as overstating culpability. Correct? I don't think it was quite like that, Judge. It was close enough because you got an extraordinary, your client got an extraordinary downward variance. But the end result, as Dowell and Taylor say, doesn't mean that an informed judge might not have done more. Consider what the – Is that sufficient? So just tell me how the rather strict standard, the Strickland standard for ineffective assistance of counsel works in this context. Is it enough for someone to come up and say, yes, he acknowledged this problem? He came in saying he was planning to give a much higher sentence. And then he came and said he acknowledged this problem. He got information. You haven't challenged the quality of the information he got. You haven't suggested that counsel should challenge the quality of the information he got from the government. And he made a very, very significant downward variance, and you haven't shown that that was not as much as other people would do. Is it enough to prejudice say, well, he could have done more? What is your best case that that is sufficient to establish prejudice in this context? In this context, I think alcohol would be the best case. That was a suicide decision by the Second Circuit. Was that a finding of ineffective assistance of counsel? No. No, but it's not helpful in helping me to figure out how I analyze prejudice under Strickland, an ineffective assistance of counsel claim. So what's your best ineffective assistance of counsel claim in a sentencing context that says, well, the chance that the judge could have gone lower is enough. That's all I have to show for prejudice. Taylor, this circuit, look at Dow from the Seventh Circuit. It's the same analysis. Quote to me where we said, what was said in those cases, that as long as a judge could have gone lower, went really low already, but could have gone lower, then counsel was ineffective? Well, yes. In Taylor, Your Honor, Taylor, which is 139, 139, Fed Third at 924 Jumpsite is on page, looks like it's page 930, 924, and the Jumpsite looks like it's on page 933. Taylor's allegation that trial counsel had failed to inform him of his defense, due to his conflict of interest, presents a valid Kylo claim. Even trial counsel succeeded in obtaining for Taylor what appears, in fact, to be a favorable plea agreement. That was a conflict of interest case. We have a different prejudice test for conflict of interest cases. But you asked me specifically. Actually, I'm telling you, that's not on point because we have a different prejudice test in conflict of interest cases. We just simply assumed the existence of prejudice. I believe in Dow, Your Honor. That's 694, Fed Third, 898, Seventh Circuit case. Are these in your brief? Yes, of course. Okay. I don't see Taylor in your brief. I cited Dow twice in our reply brief because the government raised that issue. Oh, they're not in your opening brief. Okay. Okay. Go ahead. That was ineffective assistance to counsel. Yes, they're both ineffective assistance. Again, I told you the conflict cases are different, though. Now, do you want me to give you the court, Your Honor? What was the error in that case? Dow versus United States. You asked for the- Yes. What was the error that counsel committed in that case? The error was about the inquiry about the merits of an appeal. Should it do an appeal or not? Yes. Let me read this short sentence, Senator Reckon. While we know that it is true that the district court imposed a below guideline sentence, it might have imposed an even lower one if Dow were not a career offender. Without career offenders' status, his criminal history would have been no higher than three. The resulting guidelines range would have been much less than it ultimately was. Had that error in calculating the sentence guidelines range been brought to the attention of the district court in that case? I do not. No. No. That's what I keep telling you is the difference in this case. The problems with the lost table were brought to the attention of Judge Walton. He obtained information and he dealt with it. So what you have to show is not that he wasn't aware of this problem. That would be a different argument. He was aware. He asked for information and he responded. So then what you have to show is if he had been given more arguments about it, more arguments, he would have done more. That's my point to you that you need to show prejudice and just saying, well, maybe. What I'm saying to you is that this guideline suffers from a number of deficits. These recommended ranges are extremely high. They were based on an empirically invalid set of data. That's by excluding probationary sentences for one thing. They skewed higher. They started off saying we're going to sentence people to short, but certain prison sentences. There was no requirement for that in the SRA. Over time, these guidelines of the lost tables have gotten highly inflated, and as a result, you're seeing much longer sentences than was the case prior to the early 80s. In addition, you're dealing with a guideline that was inflated due to political pressure. The numbers cannot possibly be validated. As I tried to explain in our brief, Your Honor, I'm not a statistician. I don't play one on TV or in a courtroom, but these numbers, the increments, they're just artificial. They're just plucking numbers, and there are arguments that should have been presented. Some or all were available and should have been presented to Judge Walton. We don't know where they were done, but we do know. I also noticed that his trial counsel, Mr. Merritt's trial counsel's principle argument at sentence was that a lot of his losses weren't even foreseeable or reasonably foreseeable to Mr. Merritt. Did Ms. King object to the PSR on that basis? Your Honor? Did she object to the PSR on that basis? No, she didn't. She was late without arguing, and it didn't make sense. It makes a lot of sense to say something's not reasonably foreseeable. In fact, I think Judge Walton said he would have benefited from briefing on the issue, but she didn't provide that. Okay. But you haven't raised that as an effective assistance to counsel.  Okay. She also argued that you shouldn't get the four-point organizer leader enhancement, right? She didn't object to the PSR. It was a pretty weak argument. Right. She didn't point to evidence. She didn't argue it really in her sentencing memo. And so why wasn't that raised as an ineffective assistance to counsel argument here? I haven't put it in my brief. No. Where's it in your blue brief? What I put in a reply brief. You can't raise new issues in your reply brief. Where in your blue brief did you say she was ineffective because she did not effectively argue challenge the organizer leader enhancement, which requires some demonstration that Mr. Merritt controlled somebody. That would have been a frivolous argument, Judge. What? Are you kidding me? No. Judge, in this particular case, there's five or more people who. I'm sorry for frivolousness. So show me what evidence in the record there was that Mr. Merritt controlled. Organizer requires evidence of control. Organizer leader requires evidence of control. Structuring, Your Honor.  The argument would be. Okay. We're just disagreeing. Okay. I don't have any more questions on it. All right. I'll reserve one brief. Thank you. Okay. We'll give you a minute or so. Thank you. Morning again, Your Honors. In this case, the argument of regarding the loss table that Mr. Merritt's counsel has placed in his opening brief, not arguing that does not show a colorable ineffective assistance of claim, ineffective assistance of claim. In this particular case, Mr. Merritt's counsel has pointed out because he has not shown that there is any hope of a different, more favorable outcome. In order to show strict when prejudice, the likelihood of a different result has to be substantial, not just conceivable. And in his opening brief, Mr. Merritt's counsel has simply said that it's impossible to say how the trial judge would have reacted had this loss table argument been presented at sentencing. And here, as Your Honors has pointed out too, Judge Walton had clearly already significantly varied downward, a total of 78 months from the low end of the guidelines range. Based on cases that the parties had presented that were similar in this jurisdiction, a series of those cases was presented by Mr. Merritt's counsel at the sentencing hearing. In addition, there's no basis here to require the United States Attorney's Office to create a database of cases that inculcate or involve the loss table. I don't think there's much to that argument, personally. My colleagues. Thank you, Your Honor. And ultimately, he has not shown the colorable claim that's necessary for a remand to the district court here. You know, and you may not know, so the government was able to provide Judge Walton with some comparator sentences showing how other judges in this district had departed or varied based on the loss table. How did the government have those at hand or how did it aware of them? I frankly don't know, Your Honor.  I have not, I don't have any information that there's some sort of giant piece lurking in our office. That's probably the best thing I can say about it. You did a good job for a law professor. And it really ultimately here, the test for ineffectiveness is not whether or not a counsel could have done more. And that's really what's been asked of here is that defense counsel at sentencing presents something that's at this point an academic argument. There haven't been court, this court has not said that the loss table is so flawed that it should not be used. And certainly there isn't any indication in the record at all that there would be likelihood of a substantial lowering of Mr. Merritt's sentence if the loss table was not used at all in this case. Is that the test is substantial lowering? I meant to say substantial likelihood of more favorable, a lower sentence. I was referring to the Harrington v. Richter test for prejudice. I'm not quite sure how someone would show this, but I guess if they looked at all the comparators and found out he would have gotten one day less in prison, and there was substantial evidence that he would get one day less in prison, then I assume that would count as prejudice? That would count as prejudice. I was not trying to say that it would have to be a large amount of time. Any loss of liberty? I think it would be prejudice, yes, Your Honor. But it has to be shown by substantial evidence that that would occur. Right, right. And Mr. Merritt has not shown that in this case. And so for those reasons, we respectfully request that the judgment be affirmed. Can I ask you about the penalty trial one? Certainly, Your Honor. It just struck me as different than a lot of others. Sorry. Because Mr. Merritt was going to plead guilty, and then during the colloquy said protests of his lack of knowledge or culpability, lack of criminal mind for what he was doing. He didn't mean to be, with the requisite intent at least, mean to be doing something unlawful. And so Judge Rollins said, well, you can't plead guilty. You've got to go to trial. So then he gets to trial, and he continues with the same position, but he didn't understand that what he was doing was resulting in illegal actions as opposed to helping someone to get a good result from the OTR. And so then he gets hit with a much larger sentence for failure to acknowledge guilt. But it was the very same thing that Judge Bolton said you have to go to trial on. I haven't seen a case like that where it seems like he can't win. He wanted to plead, but he wanted to speak honestly to the court under oath. We want people to speak honestly to the court under oath, of his understanding of what he did. You know, this is a complicated system here. And then when he goes to trial and is consistent, he gets hit for, and it just feels like he sort of was trapped between, he couldn't win by stating his understanding of his mindset under oath. What happened here is, Your Honor, he did actually plead guilty in this case. And when he got to sentencing... Well, one of the cases here, not the... He went to trial. He did go to trial in this case, but he had actually entered a guilty plea beforehand. And then when it came time for his sentencing in November of 2022, that's when his attorney made statements indicating that he did not believe he was culpable. And for that reason, the judge... So during the plea colloquy, did he admit that he knew? He did. I don't recall all the language, but that plea did go through, Your Honor. And it was at the sentencing then when his counsel... Oh, was it the sentencing? You're right. I'm sorry. You're right. Yeah. So he did enter the plea. It was unwound without his objection based on what his attorney represented. At his sentencing, he went to trial in this case. And I think what's important here is it wasn't a penalty for him standing trial. He, as Judge Walton found, lied during trial. He perjured himself. And he ended up receiving an obstruction enhancement for that, ultimately, at his sentencing. So this wasn't a situation where somebody just wanted to have their day in court. And the jury rejected his theory that he didn't know what was going on, as shown by their verdict. And nor did he testify. He did testify at trial. And you don't, as far as the leader enhancement goes, you don't, if you voluntarily choose to withdraw from a plea, you don't keep the right to the sentence that was, that you have rejected by doing so. So there wasn't a trial penalty. He got to say what he wanted at trial. He was, again, allowed to speak at the sentencing hearing. And, again, the judge found that he really wasn't helping himself. Because, again, he was trying to act as if he hadn't done anything wrong. And the judge agreed with that. Thank you, Your Honor. All right. Mr. Lepper, we'll give you, you said you wanted one and a half minutes? How much time did you give me, Your Honor? You said you wanted one and a half minutes. That's fine. Let me talk about the trial penalty argument briefly. I'm sorry, what? Trial penalty argument. The trial penalty argument. First of all, it's not plain error because Mr. Merritt was sentenced before Mr. Slater was. So Mr. Merritt would have had no way to assess, to compare his sentence versus Mr. Slater. Mr. Slater got 27 months to cooperate her. Mr. Merritt got 110 months. That's over fourfold. That's a significant jump. Now, I don't, we don't challenge the obstruction adjustment. That's not in play. But the managerial role is in play because what the government said at the time, the plea negotiations, was Mr. Merritt and Mr. Slater were co-partners, co-equal. Suddenly, at the trial, Mr. Merritt became the most culpable. The government did not seek a role adjustment prior. They sought a role adjustment afterwards. They certainly saw a penalty for going to trial. And Judge Walton alluded at the trial, outside the sentencing process, to Mr. Merritt having rejected the plea and going to trial. You're looking at a number that's four times what the cooperator got. The cooperator had a higher guidelines level, was a public official, and emerged with one-fourth of what Mr. Merritt received. Mr. O'Connor, how should we think about if the government gives, and I'm not saying this happened in this case, I just haven't practiced criminal law myself, if the government gives a particularly sweet deal by doing something like characterizing someone as not having a leadership role in order to make available a better sentence and induce them to, does that then set up the objection that you're making, like necessarily if they revert back and say what we really think is that he played a leading role and we're going to go there at trial? Is that just impermissible? It's not impermissible for them to make an inducement for somebody to plead. The problem is when you end up with a result like this, it's fourfold. The ABA looks at fourfold as evidence of a trial penalty after factoring in facts not known before trial, which is not what's at issue here. It's an issue on the leadership role, but very much an issue on obstruction and responsibility. And they could take that into account, but that's two points. We're talking four points on the leadership. So, no, I don't have any problem. This is plea bargaining. We understand that. The system works on plea bargaining, so to the Lord. It seems like all you're saying is that if the sweetener was something that's substantial, in other words, if the prosecution says we think the facts would support a leadership role enhancement, but at the plea stage we're actually willing to set that aside, then it does seem like your theory is that they cannot then at trial bring that back into play because it would create that multiplied degree of enhancement. If it does, if it plays a role, no pun intended, and I think it clearly did play a role here, and that's a signal that there's a trial penalty that's attached. The fourfold is not only flowing from the role enhancement. It's flowing from the combination of no exceptions of responsibility, role enhancement, and am I wrong? No. There's four points. He was 30. Then 30 was his guidelines, and he got two for the obstruction, 32, and four for the manager, for the organizer leader, rather, and he came up with 36. That's a significant jump. Right, but if we set aside the obstruction, which wasn't known and therefore isn't in play in assessing whether there's a trial penalty, then what is the difference just attributable to the role enhancement? I think the difference is a significant portion. But it's not fourfold. Not what? Fourfold. No, but it certainly could have been part of a threefold. This threefold is also been identified by the NACDL with data backing it up as a suggestion of a trial penalty. Was it a threefold? Do you know? Was it a threefold? Did you do the calculation? Yes. It's in my brief, both my opening and my replies. A threefold without the? Without the exceptions of responsibility and obstruction. I don't remember. I thought you combined them all and looked at the sentencing range at the police station, the sentencing range post-conviction, post-trial. I think that's right. And I guess to me, given that you're focusing on the role enhancement as the one that's impermissible, that a different calculation would actually be relevant. I mean, if you're going to have supplemental briefings from them on your first issue, I'll be happy to file a supplemental brief on this as well. But it's clear with four points is it's a large number and a guidelines calculation. You're asking for a whole different kind of sentencing than what we traditionally do. You're saying that now district courts should have to look at cooperators and compare how many times more is this one versus that one within a case, even though each of the individual characteristics is taken into account by the guideline range. Slater got acceptance of responsibility and substantial assistance. Your guy got instruction of justice and leader enhancement. I mean, this is just not the way sentencing is done, and you're asking for a revolution in sentencing. No. Yes, because you're basically saying that when there's plea bargaining and government says when they offer you the plea, we're not going to ask for the leader enhancement, they can't later ask for it if you turn down the plea. You're asking for a revolution in sentencing. I'm not. Judge, let me explain what I'm saying to be as succinct as possible. When you have numbers like this, four times what the cooperator got, that should give a court some help. How uncommon is that? I'm sorry? How uncommon is that? How uncommon is that? Like, for you to come here and say that's an extraordinary thing, you should be able to back that up. Does that not happen? I think my open and brief referred to data from NACDL studies and the ABA studies, both of them. So within cases when somebody is a cooperator and somebody is not, and the cooperator gets a much less sentence, it's highly unusual for the cooperator to get a sentence that's whatever, a quarter of what a ‑‑ I don't know that that's true. Anecdotally? I mean, it doesn't strike me as extraordinary or surprising as I see here, but I'm just wondering if you have data on that. Well, I think the ABA and the NACL did talk about how cooperators get significantly less, significantly less, but not like this. We're talking fourfold. That's a big number. So you're saying that in every case where there are cooperators, district courts should be looking and doing this mathematical calculation, and if it's fourfold, they what? They're not allowed to assess a four‑level enhancement? What is the rule you're asking for here? What I'm asking for is a court, a district court in its measured discretion to ask itself, am I imposing a number? No, you're asking us to require the district court to make a calculation that something is fourfold, and therefore they cannot assess a four‑point enhancement to prevent the fourfold sentence. I don't understand how this would work. What I'm asking you to do is say to the district court, we normally defer to your decisions. We respect your role as a person who's got the most command of the facts on the ground, but when you give a sentence, you should consider, among other things, how large is the difference between what you're sentencing, cooperating. And if it's fourfold, you're not allowed to do that? No. That's what you're saying. You should take that into consideration. I don't understand. So, you want a reversal because he didn't do this. So, you're basically saying he has to do this. I'm saying the district court should be encouraged to consider this. And where you come up with a number like this, Judge Pann, where you come up with four times what to cooperate against. I understand what you're saying, but you're asking us to make a ruling in a case that will have precedential effect. And you're saying that we should put in an opinion that if it's a fourfold sentence over what a different cooperator got, the district court is not allowed to give a four-point enhancement because it's too high. I think what I would like your opinion to say is this, that let's start with the government's role. The government did not in any way seek a role enhancement of Mr. Slater or Mr. Merritt originally, and suddenly it reversed and decided Mr. Merritt. Happens all the time. Happens all the time. So, this is the revolution in sentencing. Like you're saying that they get the benefit of a plea deal that they turned down if they go to trial. That's why plea deals are deals. Well. We'll not do this if you do that. Right. And then when they don't do that, then they go, fine, we're going to do what we're going to do. What I want the district judges to be able to do is be encouraged not to beat out sentences that are based on facts that were known before trial, facts that ultimately and depend on, suddenly depend on the existence of those facts like the managerial role. The facts are the facts. So, the government can give a plea bargain that says we won't ask for that enhancement. It happens all the time. That's plea bargaining. The facts didn't change. I'm not suggesting that it should. I'm suggesting that the disparate result here, fourfold, should be taken into consideration. I think I understand. Thank you. Mr. Lecker, you were appointed by this court to represent Mr. Merritt in this case, and we thank you for your assistance. The case is submitted.
judges: Millett; Pillard; Pan